IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | No. 1:15-CR-102 |
| v. | ) | |
| | ) | Hon. Liam O'Grady |
| Amin al-Baroudi, | ) | |
| a/k/a "Abu al-Jud," | ) | Sentencing: June 10, 2016 |
| | ) | |
| Defendant | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, by and through its attorneys, Dana J. Boente, United States Attorney for the Eastern District of Virginia, and Julia K. Martinez, Assistant United States Attorney, hereby files this position of the United States with respect to sentencing of the defendant, Amin al-Baroudi. On January 15, 2016, the defendant entered a plea of guilty to Count One of the Indictment, charging him with Conspiracy to Unlawfully Export U.S. Goods to Syria in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Sections 1702 and 1705(a) and (c); and U.S. sanctions against Syria, as codified in Title 15, Code of Federal Regulations, Section 746.9. The government respectfully recommends the Court sentence the defendant to a term of imprisonment at the low end of the properly-calculated guidelines range of 46 to 57 months and a fine of $10,000.

## BACKGROUND

Over the course of approximately a year-and-a-half, from late 2011 into 2013, the defendant and his co-conspirators exported tens of thousands of dollars' worth of U.S. tactical equipment to Syria for the purpose of arming and supplying Ahrar al-Sham and other rebel groups.

1

Ahrar al-Sham is an armed insurgent group in Syria whose stated goal is to overthrow the Assad government and install an Islamic state in Syria. Ahrar al-Sham frequently fights alongside al-Nusrah Front ("ANF"), also known as Jabhat al-Nusrah, which has been designated by the United States as a Foreign Terrorist Organization and operates as al Qa'ida's official branch in Syria. The defendant and his co-conspirators purchased supplies from companies and vendors in the United States, consisting largely of tactical equipment such as sniper rifle scopes, night vision rifle scopes, night vision goggles, laser bore sighters, speed loaders, and bullet proof vests. The defendant and his co-conspirators traveled with the goods aboard commercial flights to Turkey and then transported the goods into Syria or provided them to others for transport. The defendant personally made two such trips, in February and March of 2013.

### Statutory Framework

IEEPA gives the President of the United States broad authority to regulate exports and other international transactions in times of national emergency. *See* 50 U.S.C. § 1702(a)(1). IEEPA controls are triggered by an executive order declaring a national emergency based on an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." *See* 50 U.S.C. § 1701. Executive orders issued under IEEPA may impose broad trade restrictions against a particular country that bar U.S. persons from engaging in a broad range of transactions involving the offending foreign government or its nationals, unless specific authorization is obtained in advance.

On May 11, 2004, the President issued Executive Order 13338, declaring that "the actions of the Government of Syria, in supporting terrorism, continuing its occupation of Lebanon, pursuing weapons of mass destruction and missile programs, and undermining United States and

international efforts with respect to the stabilization and reconstruction of Iraq, constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." The Executive Order imposes U.S. sanctions against Syria, including a broad prohibition on the export and re-export to Syria of virtually all U.S.-origin goods, without prior authorization. In accordance with Executive Order 13338, the U.S. Department of Commerce, Bureau of Industry and Security (DOC/BIS), implemented sanctions on Syria by issuing a General Order and corresponding regulations. *See* General Order No. 2 to Supplement No. 1 to Part 736; 15 C.F.R. Part 746.9.

With certain limited exceptions not applicable to this case, U.S. sanctions against Syria prohibit, among other things, the export, re-export, sale, or supply, directly or indirectly, of U.S.-origin goods from the United States or by a United States person wherever located, to Syria or the Government of Syria without prior authorization from the Secretary of State or the Secretary of Commerce. At no time relevant to the indictment did the defendant or his co-conspirators apply for, receive, or possess a license or authorization to export any goods, technology, or services, of any description, to Syria. At all relevant times, the defendant was fully aware that exporting U.S.-origin goods to Syria was illegal.

**ARGUMENT**

**I.     Legal Standards**

In considering an appropriate sentence, a district court examines both the Sentencing Guidelines and the statutory factors established under 18 U.S.C. § 3553(a). *See United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). To determine a sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *Id.* "Then, the court shall consider that range as well as other relevant factors set forth in the

guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *Id.* Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a).

Although the Sentencing Guidelines are advisory and are only one of the factors listed in § 3553(a), the Guidelines assist the court by "'provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities.'" *United States v. Booker*, 543 U.S. 200, 264 (2005) (quoting 28 U.S.C. § 991(b)(1)(B)). *See also* 18 U.S.C. § 3553(a)(6). Indeed, in the ordinary case, there will be a significant amount of overlap between the Guidelines range and the remaining § 3553(a) factors because the Guidelines "reflect a rough approximation that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). The Guidelines, for example, encompass the most salient aspects of "the nature and circumstances of the offense" (by establishing an Offense Level that incorporates aggravating or mitigating circumstances such as loss amounts, number of victims, and a defendant's role in the offense), as well as reflect "the history and characteristics of the defendant" (most notably by establishing a Criminal History Category based on the defendant's prior criminal record). 18 U.S.C. § 3553(a)(1). The Guidelines further help to prevent "unwarranted sentencing disparities" by ensuring that defendants who have committed similar crimes and have similar criminal records will receive roughly similar sentences, regardless of the district and courtroom in which they are sentenced. 18 U.S.C. § 3553(a)(6). *See Gall v. United States*, 552 U.S. 38, 46 (2007) (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Thus, although the Guidelines

are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively. *Gall*, 552 U.S. at 49.

II. **A Sentence at the Low End of the Guidelines Range is Appropriate Based on the § 3553(a) Factors.**

A sentence at the low end of the guidelines range of 46 to 57 months is necessary and sufficient to account for the sentencing factors prescribed by 18 U.S.C. § 3553(a).

*Nature and Circumstances of Offense*

The Executive Branch has determined, as a matter of foreign policy and national security, that the threat posed by the government of Syria is so severe that only sanctions so strict that they effectively prohibit the export of *any* U.S.-origin good, technology, or service are adequate to protect the interests of the United States. That determination is within the sound judgment of the Executive Branch, and current events in Syria during and since the defendant's conspiracy also profoundly demonstrate the national security interest in restricting the export of goods and services to Syria. Syria has been designated a State Sponsor of Terrorism since December 1979. The recent political situation in Syria and the ongoing civil war that has torn the country apart has created an environment even more conducive to terrorism. In the last several years, designated Foreign Terrorist Organizations ("FTOs") ANF and Islamic State of Iraq and the Levant ("ISIL") have established themselves in Syria, gaining territory and resources.

The defendant's export of tens of thousands of dollars of U.S.-origin goods to Syria repeatedly undermined U.S. sanctions against Syria and the President's declaration that the actions of the government of Syria constitute a threat to the national security of the United States. The Sentencing Commission has reflected the seriousness of violations of U.S. sanctions against Syria

by assigning a base offense level of 26 to all export offenses that implicate national security concerns, as does the defendant's offense. The government respectfully submits that the Court should give considerable weight to the Sentencing Commission's determinations regarding the seriousness of the offense in fashioning a sentence. Though the sentencing guidelines do not differentiate offense level based on the nature of goods involved, the nature of goods that the defendant and his co-conspirators exported are such that there can be no question of the likely harm the defendant caused by introducing those goods to war-torn, terrorism-infected Syria.

The defendant's explicit purpose in selecting items to export was to aid violent fighting by groups such as Ahrar al-Sham. For example, prior to his February 2013 trip to Syria, the defendant created a document listing various supplies, accompanied by pictures and descriptions, such as: "3-9x30mm high quality rifle scopes. Proven to be real good in our environment. Sent 100s of them, used in Idlib and Halab Very successfully. People loved them and always asking for more. Capable to transfer any decent rifle to sniper rifle." Idlib and Halab – another name for Aleppo – are cities in northern Syria.

The defendant maintains, and the government has no reason to doubt, that his motivation in aiding the violence in Syria was to help the Syrian people and not to hurt the United States. But this misguided notion demonstrates the importance of the sanctions in the first instance. Introducing tactical equipment such as sniper rifle scopes, laser bore sighters, and speed loaders to a war-torn, politically unstable country housing terrorist organizations creates a very real risk that those items will end up in the hands of groups and individuals who wish harm to the United States.

The year following the defendant's two trips to Syria, ISIL made significant gains in areas near where the defendant reported the use of items he exported, such as sniper rifle scopes. *See* U.S. Department of State, <u>Country Reports on Terrorism 2014</u>, Chapter 2 (available at

http://www.state.gov/j/ct/rls/crt/2014/239407.htm) (noting "aggressive pushes by ISIL into . . . central and northern Syria" in 2014). Neither the defendant nor the government can know where the tens of thousands of dollars of equipment the defendant exported are today or who is in control of them. But the rise of ISIL in recent years and the active presence of ANF – a direct affiliate of the group the defendant supplied – certainly suggest that members of these groups may have come across items the defendant supplied. That is not to say that the defendant intended to support terrorism. But by substituting his own judgment for that of the President of the United States and those entrusted with protecting our national security, he may effectively have done just that.

*History and Characteristics of the Defendant*

The defendant was born in Hama, Syria, in 1965. He lived in Syria until 1982, when his family relocated to Saudi Arabia to escape violence and unrest in Syria. The defendant immigrated to the United States in 1992. He met and married his now ex-wife and ultimately became a naturalized United States citizen. He divorced in 2013. He has two adult children. Prior to his departure to Syria in March 2013 he resided in Irvine, California.

The government acknowledges that the defendant has demonstrated remorse for his actions and accepted responsibility for his role in the conspiracy.

*Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who have Been Found Guilty of Similar Conduct*

A sentence within the guidelines range of 46 to 57 months is consistent with sentences imposed on similarly-situated defendants. Though there are extremely few examples of defendants charged with violating IEEPA by exporting items to Syria, there are many analogous cases involving other countries against which the United States has imposed broad trade embargos. For example, in *United States v. Mohammad Reza Hajian*, 08:12-cr-00177 (M.D.

7

Fla.), the defendant pleaded guilty to one count of conspiring under 18 U.S.C. § 371 to violate IEEPA for exporting computers and computer-related equipment to Iran, and was sentenced to 48 months' incarceration. In *United States v. Jason Jian Liang*, 8:10-cr-00116 (C.D. Cal.), the defendant pleaded guilty to conspiring to violate IEEPA for exporting a thermal imaging camera to China and was sentenced to 46 months' incarceration. In *United States v. Laura Wang-Woodford*, 03-cr-0070 (E.D.N.Y.), the defendant pleaded guilty to one count of conspiring to violate IEEPA for her involvement in shipping aircraft component parts to Iran through other countries, and was sentenced to 46 months' incarceration, which was the upper range of the stipulated 37-46 months contained in the parties' plea agreement, as well as a $12,500 fine. In *United States v. Arsalan Shemirani*. 12-cr-00075 (D.D.C.), the defendant pleaded guilty to one count of conspiring under 18 U.S.C. § 371 to violate IEEPA for exporting electronic parts and components to Iran and was sentenced to 48 months' incarceration. In *United States v. Michael Edward Todd*, 05:10-cr-0058-1 (M.D. Ga.), the defendant pleaded guilty to one count of conspiring under 18 U.S.C. § 371 to violate IEEPA and the Arms Export Control Act for exporting military aircraft equipment to Iran and was sentenced to 35 months' incarceration and a $10,000 fine. That 35-month sentence took into account the defendant's substantial assistance in the lure and arrest of a co-defendant. Todd's co-defendant, who also assisted in the lure and arrest of an Iranian procurement agent, was sentenced to 56 months of imprisonment. *See United States v. Hamid Seifi*, 05:10-cr-0058-3 (M.D. Ga.). *See also United States v. David McKeeve*, 131 F.3d 1 (1st Cir. 1997), (51-month sentence after jury verdict in IEEPA prosecution for sending computer products to Libya in violation of embargo).

*Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public*

The seriousness of the defendant's crime plainly warrants a substantial sentence. A significant term of imprisonment may also deter others from undermining U.S. foreign policy and national security interests by ignoring export restrictions such as the sanctions against Syria. Sentences in white-collar cases, arguably more so than in any other area of criminal law, can have a substantial deterrent effect. Through its just punishment of the defendant in this case, the Court can send an appropriate message that export violations are – as Congress and the President intend them to be – grave matters that warrant real punishment.

## CONCLUSION

For the foregoing reasons, the Court should sentence the defendant to a term of imprisonment at the low end of the guidelines range of 46 to 57 months and impose a fine of $10,000, at the low end of the guidelines range. The Court should further incorporate the previously-entered consent order of forfeiture.

Respectfully submitted,

Dana J. Boente
United States Attorney

_____/s/_____
Julia K. Martinez
Assistant United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3700
julia.martinez@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which automatically generated a Notice of Electronic Filing to counsel of record.

                                                /s/
                                      Julia K. Martinez
Assistant United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3700
Fax: (703) 299-3981
julia.martinez@usdoj.gov